[Cite as *Von Stein v. Phenicie*, 2014-Ohio-4872.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

RONALD VON STEIN, ET AL.,

    PLAINTIFFS-APPELLEES,
    -and-

                              CASE NO. 3-13-18

HERMAN SEIBERT, ET AL.,

    PLAINTIFFS-APPELLEES/
    CROSS-APPELLANTS,

    v.

DONALD PHENICIE, ET AL.,

                              O P I N I O N

    DEFENDANTS-APPELLANTS/
    CROSS-APPELLEES.

---

**Appeal from Crawford County Common Pleas Court**
**Trial Court No. 10-CV-0323**

**Judgments Affirmed**

**Date of Decision: November 3, 2014**

---

APPEARANCES:

    *Gregory R. Flax* for Appellants/Cross-Appellees

    *Harold M. Hanna* for Appellees/Cross-Appellants

Case No. 3-13-18

**SHAW, J.**

{¶1} Defendants-appellants/cross-appellees, Donald Phenicie, E. Jane Phenicie, Trustee, and Doug Phenicie (collectively referred to as the "Phenicies"), appeal the judgments of the Crawford County Court of Common Pleas finding in favor of plaintiff-appellee/cross-appellant, Herman Seibert,[1] on his claims against the Phenicies for tortious interference with his agribusiness and breach of contract. The trial court awarded Seibert $200,000.00 in compensatory damages, $35,000.00 in punitive damages, and $44,868.81 in prejudgment interest. Seibert also filed a cross-appeal assigning as error the amount the trial court awarded him in prejudgment interest.

*A.   Factual Background*

{¶2} Seibert and the Phenicies have for decades owned adjoining farmland in Crawford County, Ohio. The parties' farms are situated in the Lash Ditch watershed. Due to the relatively flat and low lying nature of the landscape, the farmland in this area has historically been subject to drainage problems.

{¶3} In 2003, the Phenicies purchased 133 acres located to the west and south of Seibert known as the "Pfleiderer Farm." The Pfleiderer Farm parcels situated to the south of Seibert were commonly described as wetland terrain by the people living in the locality. In 1959, the Crawford County Commissioners

---

[1] The record reflects that the plaintiffs-appellees in this case are Herman Seibert and the Seibert Family Trust. However, for ease of discussion we will refer to the plaintiffs in the singular as "Seibert."

approved a petition submitted by the then-owner of the Pfleiderer Farm to install a subterranean tile to alleviate the drainage problems. The Pfleiderer Maintenance Tile No. 919 (the "919 Tile") was subsequently installed in 1960 across Seibert's adjacent property located to the northeast of the Pfleiderer Farm. The 919 Tile was intended to drain subsurface water from the Pfleiderer and surrounding farms northeasterly toward the Lash Ditch waterway and eventually emptying out into nearby Honey Creek. However, despite the installation of the 919 Tile—which laid on an extremely low grade, the Pfleiderer Farm continued to flood rendering a significant portion of the land unable to produce a crop. The two parcels located to the south of the Seibert Farm, which were the ones with the most severe drainage issues, were eventually put into the federal Conservation Reserve Program where they remained until 2001.[2]

{¶4} Shortly after acquiring the Pfleiderer Farm in 2003, the Phenicies took steps to improve the drainage in order to make the land more productive. They systematically tiled the parcel situated to the west of Stevens Road, connected the tile to an existing 10-inch tile main, and drained the water east under Stevens Road to a low lying grassy area between Seibert's land and the Pfleiderer Farm. The Phenicies also systematically tiled the two parcels of the Pfleiderer Farm located

---

[2] The Conservation Reserve Program is a land conservation program administered by the USDA's Farm Service Agency. Farmers enrolled in the program agree to remove environmentally sensitive land from agricultural production and to plant species that will improve environmental health and quality in exchange for a yearly rental payment.

to the east of Stevens Road and to the south of Seibert to drain into the 919 Tile. With an increased volume of water being drained from the Pfleiderer Farm, the existing drainage system needed to be modified.

{¶5} In 2003, Don Phenicie approached Seibert about creating a west-east overflow ditch between the Seibert and Pfleiderer Farms (referred to as "Stevens Road Ditch"). The parties reached a verbal agreement regarding the installation of Stevens Road Ditch. The Phenicies hired an excavator and Seibert agreed to pay half of the expense for the project. The completed project included a west-east segment extending from Stevens Road to the northeast corner of the Pfleiderer Farm and a north-south segment, situated entirely on the Seibert Farm, which joined the west-east segment at a 90 degree angle at the northeast corner of the Pfleiderer Farm.

{¶6} The ditch itself was seven feet deep at the center and fourteen feet wide at the top of the bank. The design of the ditch permitted both the accumulated subsurface water as well as the surface water run-off to flow into the existing subsurface tile system, which included the 919 Tile and a 20-inch tile, (the "Lash Tile"). The ditch was constructed over the three air vents or "junction boxes" connected to the 919 Tile and the Lash Tile to allow water into the air vents. These three air vents were considered the "outlets" for Stevens Road Ditch into the 919 Tile and the Lash Tile, which would then carry the water

northeasterly to the Lash Ditch waterway. The Phenicies also installed a pumping station on their side of the ditch to assist with the removal of the water from the Pfleiderer Farm to Stevens Road Ditch.

{¶7} Soon after the excavation, Seibert began to experience increased flooding on his property. Seibert believed that the flooding was caused, in part, by the fact that when the ditch was excavated most of the earth or "spoil" removed from the ditch was placed in an embankment on the Phenicies' side. Consequently, the water flooded over the side of the ditch and pooled in a low lying portion of Seibert's field. Seibert and the Phenicies conversed several times regarding Seibert's dissatisfaction with the functionality of Stevens Road Ditch, including the fact that Seibert's side of the ditch was not embanked during the excavation. However, these conversations only served to fuel the discord between the parties. Seibert eventually purchased equipment to haul 300 loads of dirt from a neighboring field to build an embankment on his side of the ditch in an effort to ameliorate the flooding.

{¶8} In 2005, several neighboring landowners including, Seibert and Don Phenicie, agreed to excavate and improve the Lash Ditch waterway north of the parties' farms to address the continuing drainage problems in the watershed. Doug Phenicie, Don's son, won the bid for the job and in 2006 he began the project. Seibert refused to pay his share of the cost based on his experience with

the Phenicies and Stevens Road Ditch. However, Seibert deposited the amount assessed for his portion of the project, $1,641.40, with the Crawford County Clerk of Courts. As a result of Seibert's refusal to pay, Doug Phenicie stopped the project just north of the Phenicie/Seibert property line and the improved Lash Ditch waterway was never connected to the Stevens Road Ditch system.

{¶9} Seibert continued to experience significant flooding in his fields which resulted in yearly crop loss prompting him to take defensive steps to stop the flooding. In 2006 and 2007, Seibert blocked the air vents to the 919 Tile located under the impounded water in Stevens Road Ditch in an effort to prevent the flooding of his land. Seibert surmised that the air vents were not intended to take in the volume of water directed into them by the ditch, which caused the tile to be overburdened. As a result, the water would remain in the tile line instead of steadily discharging north into the Lash Ditch waterway. Seibert's act of obstructing the air vents resulted in the Phenicies losing their only drainage outlet from the Pfleiderer Farm to the 919 Tile.

{¶10} The Phenicies subsequently installed an "obstruction," which consisted of mounded dirt, near an air vent of the tile system located to the north of Seibert's farm close to the newly excavated Lash Ditch waterway. Seibert considered this obstruction to be a "dam" that was intentionally placed there by the Phenicies to prevent the drainage of surface water through the natural

depressions in his field into the Lash Ditch waterway. Seibert believed that this "dam" along with the lack of connection of Stevens Road Ditch to the Lash Ditch waterway improvements contributed the increased flooding of his fields. In response, Seibert drove his backhoe to the northern edge of his property and knocked down the "dam" located in the Phenicies' field just over the property line. Seibert's actions prompted the Phenicies to call the Sheriff and demand that legal action against Seibert be taken. This narrative repeated itself several times as the Phenicies rebuilt the "dam" and Seibert in turn knocked it down with his backhoe. No charges were filed against Seibert, but the parties' relationship continued to further deteriorate.

{¶11} In 2011, the Phenicies did not plant a crop on the southern parcels of the Pfleiderer Farm. Nevertheless, when Seibert prepared to plant his fields, the Phenicies turned on their pumps causing Seibert's fields to flood. Seibert was forced to wait a week until the fields dried before he could attempt to plant again. Seibert accused the Phenicies of intentionally turning on their pumps to interfere with his planting and delay his harvest. In response, Seibert called the Sheriff, who attempted to resolve the dispute. After the pumps were turned on for a second time preventing him from planting his crop, Seibert cut the underground

electric line to the pumping station, which ran across his property from Doug Phenicie's house.[3]

*B. Procedural History*

{¶12} On March 26, 2008, Seibert along with Howard Von Stein and Edward Von Stein, who also owned land in the watershed, filed a complaint commencing this case, in case number 08-CV-0145, against Donald Phenicie and E. Jane Phenicie, Trustee. The complaint asserted claims stemming from allegations that the Phenicies' attempts to improve the drainage on the Pfleiderer Farm overburdened the existing tile system and prevented the Plaintiffs from utilizing the 919 Tile to drain their fields. The Phenicies filed an answer with counterclaims alleging that Seibert's actions of obstructing the air vents under Stevens Road Ditch resulted in them losing access to the 919 Tile. Doug Phenicie joined as a counterclaim-plaintiff asserting a claim against Seibert for the $1,641.40 Seibert owed for the Lash Ditch improvement project.

{¶13} On August 12, 2008, the Crawford County Commissioners informed the parties that the County would begin construction on the 919 Tile to restore the tile to its original design.

---

[3] The record indicates that when the parties were on better terms Seibert permitted the Phenicies to run an electric line through his property so they could save on electricity expenses. Doug Phenicie's house was located near the northern property line between the Seibert and Phenicie farms. After Seibert severed the electric line, the Phenicies placed an electricity meter near Stevens Road Ditch.

{¶14} On April 1, 2009, in case number 09-CV-0176, Seibert filed a separate complaint against the Crawford County Commissioners requesting the trial court enjoin the County from performing any maintenance work on the 919 Tile. Seibert alleged that the proposed maintenance work would obstruct the flow of surface water run-off and result in the flooding of his property. The trial court subsequently consolidated the case with case number 08-CV-0145.

{¶15} On July 8, 2010, in case number 10-CV-0323, neighboring landowners Ronald Von Stein and Eric Von Stein filed a complaint against Donald Phenicie and E. Jane Phenicie asserting claims pertaining to the Phenicie's drainage improvements on the Pfleiderer Farm and the effects on the 919 Tile which caused their fields to flood. The Phenicies filed an answer and counterclaims. The trial court consolidated the case with case number 08-CV-0145.

{¶16} On December 30, 2010, all claims and causes of actions involving the Crawford County Commissioners were voluntarily dismissed by the parties pursuant to Civ.R. 41(A).

{¶17} On January 24, 2013, all the claims and causes of actions involving Howard Von Stein, Edward Von Stein, Ronald Von Stein, and Eric Von Stein were dismissed by stipulation of the parties. Accordingly, only the claims and counterclaims of Seibert and the Phenicies remained. The following causes of

action were adjudicated at trial: (1) Seibert's claims against the Phenicies for breach of contract; trespass; appropriation; tortious interference, nuisance; and punitive damages; and (2) the Phenicies counterclaims against Seibert for nuisance; trespass; conversion; violation of R.C. 901.51; negligence per se; easement by estoppel/prescriptive easement, breach of contract; unjust enrichment; contribution/indemnification; and punitive damages.

{¶18} On February 11, 2013, the case proceeded to a four-day bench trial where the testimony of ten witnesses, including expert testimony regarding the effectiveness of Stevens Road Ditch, and numerous exhibits were presented for the trial court to consider. Testimony from several witnesses established that Seibert and neighboring landowners dependent on the 919 Tile experienced increased flooding after the Phenicies attempted to improve the drainage of the Pfleiderer Farm in 2003.

{¶19} During his testimony, Seibert acknowledged that the Phenicies were free to tile their land to make it more productive. His primary contention was with the manner in which the Phenicies chose to improve the drainage and the lack of cooperation he felt they gave him. Regarding the agreement to construct Stevens Road Ditch, Seibert testified that Don Phenicie approached him about creating a waterway on the property line between the Seibert and Pfleiderer farms. Seibert agreed to the project because he believed his fields would also benefit from the

increased drainage. At the time he entered into the agreement, Seibert understood the waterway would be constructed in a west-east segment stretching eastward from Stevens Road. He believed the waterway would then continue northeasterly over the natural depressions in his field and eventually empty out into the Lash Ditch waterway. He explained that this is the manner in which the surface water had drained prior to the excavation of Stevens Road Ditch.

{¶20} Seibert recalled that Don hired an excavator who completed the project in two days. He testified that he was not able to observe the construction because he was suffering from cancer at the time and had multiple medical appointments each day. When Seibert was able to view the completed waterway he was surprised by the design.

{¶21} Specifically, Seibert testified that instead of the west-east waterway flowing into the natural depressions in his field, the Phenicies constructed a north-south segment dug entirely on his land which joined the west-east segment at a 90 degree angle. Seibert explained that this north-south segment actually diverted the water to his higher ground. Seibert also disapproved of the fact that the north-south segment was excavated over the existing air vents or "junction boxes" connected to the 919 Tile and the Lash Tile, which he believed were not designed to take in large volumes of water. Seibert maintained that this design was not part of his discussions with Don. Seibert was also dismayed to discover that nearly all

the soil from the excavation was embanked on the side of the Pfleiderer Farm, subjecting his field to increased flooding. Despite being dissatisfied with the construction of the ditch, Seibert still paid half of the excavator's bill.

{¶22} Seibert testified that when the flooding worsened he approached Don about his complaints regarding the ditch construction and failed to reach a resolution with him. Seibert explained that he eventually purchased a dump truck to haul 300 loads of dirt from a neighboring farm to embank his side of the ditch. Seibert paid his son, Chris, to help with building the embankment which took approximately 450 hours to complete. Seibert also testified that after the installation of Stevens Road Ditch he began to experience flooding in his basement. Seibert explained that the increased pressure below the concrete caused the basement walls to crack allowing water to seep in.

{¶23} Seibert admitted that, in 2006 and 2007, he obstructed the air vents which were converted into outlets for the water impounded by Stevens Road Ditch. Seibert reasoned that after the Lash Ditch improvement project was complete there was no longer a need to divert surface water into the tile system. He testified that he also believed the diverted surface water was overburdening his tile and that he "had to do something." (Tr. at 446). Seibert explained the reason why he repeatedly knocked down the "dam" near the Lash Ditch waterway was because he noticed that he did not lose as many acres of crops when the water was

allowed to follow over the "dam." Seibert maintained that all of his actions were done defensively in order to save his crops.

{¶24} Seibert testified that he had proposed a solution to the drainage problem to the Phenicies. Specifically, he stated that he was amenable to the Phenicies installing a two-inch pump directly into the 919 Tile to more expediently remove water from the Pfleiderer Farm without overburdening the tile. He also suggested creating a surface water drain over the natural depressions in his field to connect Stevens Road Ditch to the Lash Ditch waterway, thereby allowing the water to bypass the air vents and prevent the overburdening of the 919 and Lash tiles. Seibert stated that he was willing to be solely responsible for the expense of creating this surface drain. He also stated that even though the excavation of this surface drain would result in him having to retile some areas of his field, he was willing to incur the additional cost.

{¶25} Seibert testified that he was also surprised to learn during the course of this litigation that there was at least seven inches of fall gained through the excavation of the Lash Ditch improvement project that could assist in carrying the water away from his farm. Seibert believed that in such a low lying landscape access to this amount of fall would significantly improve the drainage issues experienced by several landowners in the southern part of the watershed.

{¶26} Seibert presented evidence of the damages he claimed to have suffered as a result of the Phenicies' failure to provide an adequate outlet for the increased amount of water they diverted into the existing tile system. This testimonial and demonstrative evidence, which included testimony from Seibert's son, Chris, and a real estate appraiser, was presented to establish Seibert's yearly crop loss from 2003 to 2011, the loss of value to his land, the expense he incurred to create an embankment on his side of Stevens Road Ditch, and the damage to his basement.

{¶27} Seibert also presented the expert testimony of Patrick Gosser, who gave an opinion regarding the effectiveness of Stevens Road Ditch installed by the Phenicies. Gosser testified to the unusual design of Stevens Road Ditch and commented that diverting that volume of water into the 919 Tile was not good for the whole community. Gosser explained that the air vents of the 919 Tile and the Lash Tile were not designed to take in the amount of overflow water being diverted into them by Stevens Road Ditch and as a result of the excess water the effectiveness of the tiles was being compromised.

{¶28} Gosser also discussed the topographic make-up of the watershed and noted that the Pfleiderer Farm is the lowest point and that Seibert's property running north is on a flat grade. Gosser stated that he observed in his survey of the area that there is a slight difference in elevation on the Phenicies' land north of the

property line with Seibert's that was preventing the surface water from draining off of Seibert's field and flowing into the Lash Ditch waterway. He characterized this extra depth as a "drop off" that appeared to be a result of someone cleaning out the existing surface drain and not extending it out across Seibert's property.

{¶29} In order to remedy the drainage issues Gosser recommended creating an open surface drain through the low portions of Seibert's farm, connecting it to the existing surface drain, and taking advantage of the seven inches of fall on the Phenicies' property. Gosser explained that the surface drain would be shallow enough for Seibert to plant crops across it. Gosser also recommended blocking off the north-south segment of Stevens Road Ditch, which diverts the water up to Seibert's higher ground, and pumping or draining the remaining water into an existing tile. Gosser explained that opening up this surface drain will help alleviate the overburdened 919 Tile. He also recommended modifying the drainage pumps to slow the amount of water flowing into the 919 Tile to allow the subsurface water to drain. Specifically, Gosser stated that there should be an outlet from the systematic tile on the Pfleiderer Farm into the subsurface tile system keeping the low flow water in the tile system without pumping it to the surface. Gosser opined that his recommendation would provide a global solution benefitting all the landowners in the watershed dependent on the 919 Tile.

**{¶30}** Seibert also presented the testimony of Ron Von Stein, a neighboring landowner with property in the watershed located to the south of the Pfleiderer Farm. Ron testified that his fields have experienced increased flooding since the Phenicies installed their drainage improvements on the Pfleiderer Farm. He explained that his fields are also dependent on the 919 Tile for drainage and that the actions of the Phenicies on the Pfleiderer Farm have had a significant impact on the ability of the water to flow north from his fields.

**{¶31}** Ron recalled a conversation he had with Don Phenicie in 2006 after a heavy rain caused standing water in his field. Ron related that Don showed him the "dam" near the Seibert/Phenicie property line and implied that it was placed there because Seibert refused to pay his portion of the Lash Ditch improvement project to his son. Ron pleaded with Don and told him "[i]f you're proving a point to Herman[,] you're killing me. * * * [Y]ou're killing my crops to prove to Herman that [he] didn't pay your bill." (Tr. at 626). Ron stated that Don then took him to Stevens Road Ditch where Don used his backhoe to create an opening in the embankment to allow the accumulated surface water from the Pfleiderer Farm to drain into Stevens Road Ditch. Ron recalled that it took a week for the water to drain from his fields.

**{¶32}** Ron also testified that he believed that the actions the Phenicies took to divert the water from the Pfleiderer Farm were unreasonable because the Phenicies have gained a significant benefit to their land at a great expense to him.

**{¶33}** Doug Phenicie testified that he owns a farm drainage and contracting business. Doug verified that he is the counterclaim-plaintiff in this case suing for payment from Seibert for his work on the Lash Ditch improvement project. Doug recalled his involvement with the construction of Stevens Road Ditch— specifically, that he operated the equipment and provided most of the labor. He maintained that the only reason the ditch system did not work was because Seibert blocked the outlets to the 919 Tile. He explained that most of the soil from the ditch excavation was embanked on the side of the Pfleiderer Farm due to the fact that two-thirds of the west-east segment was dug on the Phenicie side because they were installing a pumping station which required an embankment. Doug recalled Seibert's complaints regarding the lack of embankment on his side and stated that he tried to explain to Seibert that an embankment on his side was not advantageous because it would trap the water on his property. He also stated that the excavation of the north-south segment did not produce very much soil because it was not dug as deep as the west-east segment. Doug disagreed with Seibert regarding the intended use of the tile air vents and stated that they were "inlets" designed to allow water into the tile. He explained the north-south waterway was

dug in that particular location because they did not want to cut off Seibert's tile. He also denied claims that the water diverted into Stevens Road Ditch overburdened the 919 Tile.

{¶34} Doug discussed his involvement with the Lash Ditch improvement project. Doug described the condition of the waterway prior to him cleaning it out—specifically, that there was 16-20 inches of sediment in many places. He explained that when the landowners gathered to discuss the parameters of the project, the original concept was to stop far north of the Seibert and Phenicie farms offering no benefit to either party even though they were going to be assessed for the project. Doug stated that when he bid on the job, he offered to extend the project south to benefit the Seibert and Phenicie farms at no additional cost which was one reason he was disappointed when Seibert refused to pay his share.

{¶35} Doug testified that during the course of the project they found seven inches of fall. He acknowledged that this discovery of additional grade would benefit the landowners in the watershed. Doug stated that the work required to move the soil was not factored into his bid, but he moved it "out of [his] good gestures." (Tr. at 717). He admitted that the Lash Ditch waterway improvements were not continued to Seibert's property. Specifically, he stated that his "intentions were to take this all the way across. But at that time Mr. Seibert had

refused to pay his bill yet in the fall of that year, months had went by and his bill's not paid." (Tr. at 722). As a result, the improved waterway stopped short of the Seibert/Phenicie property line.

{¶36} Doug also stated that in 2007 someone removed their steel grate connection to the 919 Tile, which was later found in Seibert's barn. Doug explained that since then they have had no outlet for the water on the Pfleiderer Farm and that the only way to remove the water from the Pfleiderer Farm was to turn on their pumps. He denied ever manipulating his pumps to have a detrimental effect on his neighbors. He also refused to accept Seibert's proposal for a new waterway at the end of Stevens Road Ditch and installing two-inch pump directly into the 919 Tile. Doug maintained that Stevens Road Ditch will work properly if Seibert stopped interfering with the design.

{¶37} Don Phenicie testified that he and Seibert agreed that Stevens Road Ditch would be excavated entirely on the side of the Pfleiderer Farm. He recalled that two-thirds of the ditch was already dug when Seibert decided he wanted an embankment on his side. Don claimed that Seibert understood that the north-south segment was part of the original agreement and that the ditch would be constructed over the air vents, which would provide the outlets for the impounded water in the ditch. Don recalled the Lash Ditch improvements and corroborated Doug's testimony that the original bid did not include clearing the waterway to the

Seibert/Phenicie line, but that they did the extra work at no additional charge for the good of the community. He confirmed that an additional seven to eight inches of fall was gained through the project. He stated that Seibert never approached him about his proposal for an alternative waterway. He also denied intentionally turning on his pumps to flood Seibert's fields. However, he testified that had Seibert not blocked his access to the tile, he would have probably approached him about finishing the Lash Ditch project.

{¶38} Don denied placing a "dam" near his property line with Seibert to prevent the surface water drainage from Seibert's farm. He described the structure as a "diversion" to direct the surface water into the "junction box" located there to keep the water from running onto his field. However, Don also recalled the conversation he had with Ron Von Stein and admitted that he told Ron he placed the "diversion" near the Seibert/Phenicie property line because Seibert refused to pay his portion of the Lash Ditch project. He also demonstrated his unwillingness to entertain Seibert's proposal regarding an alternate waterway by maintaining that the original design will work when the air vents are unblocked.

{¶39} The Phenicies presented additional witness testimony regarding the loss in value of their property since the drainage issues have not been resolved. They also presented testimony to corroborate their position regarding the effectiveness of Stevens Road Ditch. One witness, Art Brate, testified as an

expert. Brate reviewed the original plans for the 919 Tile and opined that the air vents or "catch basins" were designed to take in surface water. He stated that the design of Stevens Road Ditch, while perhaps not ideal, was nevertheless an effective way of addressing the drainage issues and that Seibert blocking the outlets has impeded the drainage of all the fields to the south and west of Stevens Road Ditch. Brate further opined that Stevens Road Ditch should be connected to the improved Lash Ditch surface drain to take advantage of the additional elevation found north of the Seibert/Phenicie property line. He agreed with Gosser's opinion that creating a surface drain in the low areas in Seibert's fields would help adjoining landowners with the poor drainage.

{¶40} On May 17, 2013, the trial court issued a decision on the matter. The trial court found that the conduct of the Phenicies in diverting the surface water on the Pfleiderer Farm was unreasonable. In a well-reasoned opinion, the trial court concluded the following:

> **This Court does find, from the evidence presented, that both the inaction and actions of the Phenicies, once it became apparent that the system was inadequate were unreasonable. The system simply did not work as well as the parties had hoped and needed to be greatly improved by the implementation of additional methods such as the new proposed surface drainage from Stevens Road to drop A.[4] The refusal of the Phenicies to cooperate in additional means to obtain drainage was under the circumstances unreasonable. This fact is confirmed when it is**

---

[4] The parties referred to the air vent or "catch basin" located near the Lash Ditch waterway and the northern Seibert/Phenicie property line as "Drop A."

> **considered that Seibert agreed to bear the majority of the cost of these improvements.**
>
> **Two things are clear to the Court from the trial of these issues, (1) there are some serious flooding issues occurring on the parties['] farms, and (2) the parties each sincerely believe that their solutions are the correct ones. * * * It is, however, the facts and the law that must decide this case. The Court finds that the facts and law support [Seibert] and that [Seibert] has proven that the [Phenicies], although initially attempting to find and insure an adequate outlet, created an unreasonable situation as to [Seibert] by refusing to participate in additional ways of draining the water from the Stevens Road ditch.**
>
> **The Court therefore finds from the evidence presented that the current flooding of [Seibert's] farmland has been increased by the conduct of the [Phenicies] and that the losses imposed upon [Seibert] are an unreasonable result of the [Phenicies'] attempts to improve the Pfleiderer farmland.**

(Doc. No. 139 at 10). The trial court awarded Seibert $200,000.00 in compensatory damages for the harm he suffered as a result of the Phenicies breaching their agreement to provide an adequate outlet for the increased water and their tortious interference with Seibert's use of his land resulting in several years of flooding and crop loss. In addition, the trial court found Seibert was entitled to $35,000.00 in punitive damages for the "Phenicies' deliberate pumping and flooding of [Seibert's] fields at critical times." (Id.)

{¶41} The trial court further found that the excavation of Stevens Road Ditch over the air vents of the 919 Tile was improper and ordered that the parties "be permanently enjoined from introducing any artificially accumulated water

whether by ditch, waterway or other inducement, so that said tile may naturally drain the land for which it was designed." (Id. at 12). The trial court also ordered that a new drainage outlet be excavated at the east end of Stevens Road Ditch over Seibert's low ground and be connected to the Lash Ditch waterway. The trial court provided specific instructions to the parties regarding their responsibilities in implementing this new drainage system. Finally, the trial court found in Doug Phenicie's favor on his counterclaim against Seibert for his work on the Lash Ditch improvement project and awarded him $1,641.40.

{¶42} Seibert subsequently filed a motion for prejudgment interest pursuant to R.C. 1343.03(A) and requested prejudgment interest in the amount of $51,442.36. The Phenicies' filed a response opposing Seibert's request. On October 3, 2013, the trial court awarded Seibert $44,868.81 in prejudgment interest.

{¶43} The Phenicies filed this appeal, asserting the following seven assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED BY CONCLUDING THAT APPELLANTS BREACHED A CONTRACT WITH APPELLEES.**

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED BY CONCLUDING THAT APPELLANTS UNREASONABLY INTERFERED WITH THE FLOW OF SURFACE WATER.**

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT'S AWARD OF DAMAGES TO APPELLEES WAS NOT SUPPORTED BY SUFFICIENT CREDIBLE, COMPETENT EVIDENCE.**

## ASSIGNMENT OF ERROR NO. IV

**THERE WAS NOT SUFFICIENT CREDIBLE, COMPETENT EVIDENCE TO SUPPORT THE TRIAL COURT'S CONCLUSION THAT APPELLEES' DAMAGES WERE CAUSED BY THE IMPROVEMENT OF APPELLANTS' PROPERTY IN 2003.**

## ASSIGNMENT OF ERROR NO. V

**THE TRIAL COURT ERRED BY AWARDING PREJUDGMENT INTEREST IN FAVOR OF APPELLEES.**

## ASSIGNMENT OF ERROR NO. VI

**THE TRIAL COURT ERRED BY AWARDING PUNITIVE DAMAGES IN FAVOR OF APPELLEES**

## ASSIGNMENT OR ERROR NO. VII

**THE TRIAL COURT ERRED BY AWARDING INJUNCTIVE RELIEF THAT WILL DEPRIVE THE PHENICIES OF THE BENEFITS OF A PUBLIC WATERCOURSE AND PRECLUDE THE PHENICIES FROM INTRODUCING ANY WATER INTO THE TILE.**

{¶44} Seibert filed a cross-appeal, asserting the following assignment of error.

**CROSS-ASSIGNMENT OF ERROR NO. I**

**INADVERTENTLY OR BY MATHEMATICAL ERROR THE TRIAL COURT ERRED IN COMPUTING THE PREJUDGMENT INTEREST DUE THE CROSS-APPELLANTS.**

*First and Second Assignments of Error*

{¶45} In their first and second assignments of error, the Phenicies argue that the trial court erred in concluding that they breached a contract with Seibert and that they unreasonably interfered with the flow of surface water. Specifically, the Phenicies contend that Seibert failed to present sufficient evidence to support the trial court finding in his favor on these claims.

{¶46} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. This presumption arises because the trial court is in the best position "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the

proffered testimony." *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment. *Id*. at 81.

**{¶47}** In its decision resolving the parties' claims, the trial court noted that:

> **All of the parties['] claims against each other, with the exception of Counterclaim Plaintiff Doug Phenicie's claim for payment for his work in improving the Lash Road ditch, stem from the need for increased drainage resulting from the Defendant[s] Phenicies' decision to improve the productivity of newly acquired farmland to the south of Plaintiff Seibert.**

(Doc. No. 139 at 2). The record supports the trial court's observation that the overarching issue in this case is the Phenicies' diversion of the excess surface water on Pfleiderer Farm. In addressing surface water disputes, Ohio has adopted the reasonable-use rule which the Supreme Court of Ohio articulated as follows:

> **[A] possessor of land is not unqualifiedly privileged to deal with surface water as he pleases, nor absolutely prohibited from interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, and the possessor incurs liability only when his harmful interference with the flow of surface water is unreasonable.**

*McGlashan v. Spade Rockledge Terrace Condo Development Corp*, 62 Ohio St.2d 55, syllabus. "Under a rule of reasonableness, determined on a case-by-case basis, the essence of liability is measured by principles of common-law negligence. The pivotal issue is whether a condition on the premises represents a foreseeable and

unreasonable risk of harm." *Ogle v. Kelly*, 90 Ohio App.3d 392, 396 (1st Dist.1993) citing *McGlashan* at 61. The flow of surface water onto another's property is unreasonable if the gravity of the harm outweighs the utility of the actor's conduct or if the harm caused by the conduct is substantial and the financial burden of compensating for this and other harms does not render infeasible the continuation of the conduct. *See McGlashan* at 61 citing RESTATEMENT OF THE LAW 2D, TORTS (1979), Sections 822-831; *see also*, *Chudzinski v. Sylvania*, 53 Ohio App.2d 151, 158 (6th Dist.1976).

{¶48} Here, the record establishes that several landowners, including Seibert, who were dependent on the 919 Tile began to experience increased flooding on their properties after the Phenicies installed their drainage improvements on the Pfleiderer Farm. In determining whether the Phenicies were reasonable in their actions altering the surface flow of water from the Pfleiderer Farm, the trial court focused on the Phenicies' conduct once it became apparent that Stevens Road Ditch was not effective in handling the increased volume of water diverted into the drainage system. The trial court acknowledged that the Phenicies originally attempted to find an adequate outlet, but that the "system simply did not work as well as the parties had hoped and needed to be greatly improved by the implementation of additional methods such as the new proposed surface drainage from Stevens Road to drop A." (Doc. No. 139 at 9). The trial

court determined that the Phenicies' actions became unreasonable when they refused to modify their drainage improvements or to cooperate with Seibert and adjoining landowners to devise alternative plans to obtain sufficient drainage in the area.

{¶49} The record demonstrates that one example of the Phenicies' unreasonable conduct occurred when they intentionally deprived Seibert, and the landowners dependent on the 919 Tile, from accessing the newly improved Lash Ditch waterway and the additional seven inches of fall discovered during the project. Rather that completing the project and then pursuing a civil action against Seibert for his refusal to pay his share, the Phenicies essentially held the landowners hostage as they continued their dispute with Seibert. Another example noted by the trial court was the Phenicies' refusal to entertain Seibert's proposal of an open surface drain on his property—a plan which both drainage experts testified at trial was a reasonable solution. Notwithstanding this fact, the distain for Seibert's plan was evident in the Phenicies' testimony at trial. In refusing to cooperate with Seibert's proposal, the Phenicies insisted that the system they installed would work if Seibert had not blocked the outlets to the 919 Tile. However, the record establishes that Seibert's obstruction of the air vents occurred in 2006 and 2007. Seibert and his son testified that the increased flooding of their fields began in 2003 after the ditch was excavated.

{¶50} We also acknowledge the Phenicies' complaints attributing their financial losses to Seibert's actions after the installation of Stevens Road Ditch. However, in rendering its decision on the parties' claims, the trial court was charged with weighing the credibility of the witnesses and assessing the merits of the claims accordingly. The evidence in the record supports the trial court's findings that the Phenicies made several calculated decisions in their handling of the surface water dispute with Seibert which had a detrimental effect on the adjoining landowners in the watershed. The record further establishes that there were reasonable alternatives to the Phenicies' actions which may have avoided the perpetuation of the drainage problem over several years and the attendant losses incurred.

{¶51} In addition, Seibert testified that his actions were done solely in defense of his crops and he presented ample evidence to support his position. Nevertheless, the Phenicies' fail to acknowledge that when they undertook the project to improve the drainage on the Pfleiderer Farm, including the diverting of surface water into Stevens Road Ditch, they had a duty to act reasonably under the circumstances. *See Hiener v. Kelley,* 4th Dist. Washington No. 98CA7, *6 (July 23, 1999)(finding as a matter of law that when a party undertakes a project to divert the surface flow of water, that party owes a duty to act reasonably under the circumstances).

{¶52} Thus, the record supports the trial court's findings that the Phenicies' lack of accountability for the situation their drainage improvements created and their unwillingness to participate in alternative ways to address the drainage problem were unreasonable under the circumstances. Based on the foregoing, we find the trial court's conclusion that the Phenicies unreasonably interfered with the surface flow of water was supported by some competent, credible evidence.

{¶53} Next, we address the Phenicies' claim that the trial court erred in concluding they breached a contract with Seibert. Specifically, the Phenicies claim that the trial court erred in determining that an enforceable oral contract existed between the parties and that the Phenicies "warranted and indemnified" the success of the drainage project. Alternatively, the Phenicies argue that if a contract did exist then Seibert is precluded from prevailing on a breach of contract claim under the doctrines of consent, waiver, and estoppel.

{¶54} The "[t]erms of an oral contract may be determined from 'words, deeds, acts, and silence of the parties.' " *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3, 2002-Ohio-2985, ¶ 15 quoting *Rutledge v. Hoffman*, 81 Ohio App. 85, (12th Dist. 1947), paragraph one of the syllabus. An oral agreement is enforceable when the terms of the agreement are sufficiently particular. *Kostelnik* at ¶ 15. Complete clarity in every term of the agreement is unnecessary because all agreements have some degree of indefiniteness and uncertainty. *See Kostelnik* at ¶ 17; *see also*

*Rutledge* at 86 ("[S]eldom, if ever, does the evidence in proof of an oral contract present its terms in the exact words of offer and acceptance found in formal written contracts. And no such precision is required."). Instead, the goal in enforcing oral contracts is simply to hold people to the promises they make. *Kostelnik* at ¶ 17.

{¶55} "Upon appellate review, the existence of a contract raises a mixed question of fact and law. We accept the facts found by the trial court on some competent, credible evidence, but freely review application of the law to the facts." *McSweeney v. Jackson*, 117 Ohio App.3d 623, 632, (4th Dist. 1996). "A reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use their observations in weighing credibility of the proffered testimony." *Id*.

{¶56} At the outset, we note that it appears disingenuous for the Phenicies to argue on appeal that no enforceable contract regarding the construction of Stevens Road Ditch existed between the parties. The evidence at trial clearly establishes that both parties testified that they orally agreed to create a west-east surface waterway between their properties, that the Phenicies would handle the excavation, that the parties would split the cost equally, and that both parties indeed did pay for their share of the project. Thus, the record demonstrates that

when distilled to its most basic form the parties' agreement was comprised of promises made, an exchange of consideration, and certainty as to the essential terms. In light of these facts, we find that the greater amount of credible evidence establishes that an enforceable oral contract existed between the parties to construct Stevens Road Ditch.

{¶57} The Phenicies also contend that they never "warranted the effectiveness of the drainage system or agreed to indemnify Mr. Seibert for any losses occasioned by the systems' ineffectiveness." (Appt. Brief at 8). In making this argument, the Phenicies overlook the fact that ensuring an adequate outlet was created for the impounded water in Stevens Road Ditch was a fundamental component of the agreement, which involved diverting the flow of surface water. In its decision, the trial court specifically identified that the "failure of the Defendants Phenicie to provide for an adequate outlet when they tiled 132 [sic] acres of primarily wetland, so that it has flooded the dominant Seibert farm, was a breach of the Phenicie/Seibert drainage agreement." (Doc. No. 139 at 11).

{¶58} Moreover, we find the Phenicies' arguments challenging the trial court's decision on the basis of the doctrines of consent, waiver, and estoppel to be unpersuasive given the evidence of the parties' conduct in the record. Accordingly, we conclude that the trial court's decision finding in Seibert's favor on his breach of contract claim was not against the manifest weight of the

evidence. The Phenicies' first and second assignments of error are therefore overruled.

### *Third and Fourth Assignments of Error*

{¶59} In their third and fourth assignments of error, the Phenicies challenge the trial court's award of compensatory damages to Seibert. Specifically, the Phenicies assert that Seibert failed to present sufficient evidence of his lost profits due to the crop damage he claimed to have suffered as a result of the increased flooding of his fields.

{¶60} An appellate court may not reverse the trial court's decision determining damages absent an abuse of discretion. *Kaufman v. Byers*, 159 Ohio App.3d 238, 2004-Ohio-6346, ¶ 37 (11th Dist.). An abuse of discretion is defined as unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). In addition, an appellate court presumes the trier of fact's findings of fact are correct, which means evidence susceptible to more than one interpretation must be construed in a manner consistent with the trial court's judgment. *Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226 (1994).

{¶61} Evidence of lost profits must be presented with supporting information regarding how the profits were calculated based on facts available or in evidence. *Endersby v. Schneppe*, 73 Ohio App.3d 212, 216–217 (3d Dist. 1991). Both the existence of the loss and the dollar amount of the loss must be

proven to a reasonable certainty. *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65 (1988), syllabus. "Although lost profits need not be proven with mathematical precision, they must be capable of measurement based upon known reliable factors without undue speculation." *McNulty v. PLS Acquisition Corp.*, 8th Dist. Cuyahoga No. 79025, 2002-Ohio-7220, ¶ 87, fn. 14. The issues of the existence of lost profits and the actual amount of the lost profits are factual issues for the trier of fact. *WRG Servs., Inc. v. Eilers,* 11th Dist. Lake No.2008–L–057, 2008–Ohio–5854, ¶ 44.

{¶62} The trial court awarded Seibert $200,000.00 in compensatory damages for his breach of contract and tortious interference claims. Seibert presented evidence at trial that he suffered $177,539.06 in damages for crop losses during the years of 2003 to 2011, $13,198 in damages for the cost to repair his basement, and $10,800 in damages for the expenses he incurred in embanking his side of Stevens Road Ditch. These damages totaled $201,537.06. On appeal, the Phenicies maintain that Seibert failed to prove his lost profits to a reasonable certainty and argue the trial court's award was not supported by the evidence.

{¶63} At trial, Seibert provided extensive testimony regarding his crop losses. Specifically, he testified that he consistently lost 38 acres of crops from 2003 to 2011. Seibert explained that the 38 acres which were affected are located in the same low lying areas in his fields. Seibert testified that he obtained certified

records from the Farm Service Agency to verify the total number of acres he planted and the type of crop he planted in those acres each year. Seibert testified that he then compiled the delivery slips that he received from the local grain elevator confirming the number of bushels he delivered each year. Seibert explained that he used the weighted price for the date of delivery to determine the price per bushel. Seibert stated that he knew the price per bushel on the date prior to delivering the grain and verified the price for the delivery dates with commodities clerk at the grain elevator. Seibert used this information to compute his crop loss for the affected 38 acres each year from 2003 to 2011, which totaled $177,539.06. In support of his testimony, Seibert submitted as exhibits copies of the records from the Farm Service Agency, the delivery slips from the grain elevator, and his tabulation showing his yearly crop loss.

{¶64} We note that the Phenicies complaints regarding the trial court's damage award focus on the credibility of Seibert's testimony. As previously noted, credibility is a matter primarily for the trier of fact as it is in the best position to judge the credibility of witnesses and the weight given to the evidence. Moreover, the Phenicies did not present any evidence at trial to refute Seibert's computation of his yearly crop losses. As such, we do not find that the trial court abused its discretion in determining that Seibert proved his lost profits to a reasonable certainty.

{¶65} The Phenicies also claim the trial court erred in concluding that Seibert's damages were caused by the Phenicies systematically tiling the Pfleiderer Farm and installing a pumping station at Stevens Road Ditch. Specifically, the Phenicies contend that Seibert's testimony was insufficient to establish the causation of his damages and that expert testimony was required to prove the causal link between the Phenicies drainage improvements and the increased flooding on Seibert's farm. The Phenicies cite *State ex rel. Post v. Speck*, 3rd Dist. Mercer No. 10-2006-001, 2006-Ohio-6339 as the only authority to support this contention. Notably, *Post* is an eminent domain case which clearly presents different issues with regard to the assessment of damages that are not implicated by the facts of the instant case. Consequently, we find no error in the trial court's reliance on Seibert's or any other lay witness' testimony to establish the causation of his damages. Nor do we find the trial court's award of compensatory damages to be against the manifest weight of the evidence. Accordingly, the Phenicies' third and fourth assignments of error are overruled.

### Sixth Assignment of Error

{¶66} In their sixth assignment of error, the Phenicies assert that the trial court erred in awarding punitive damages to Seibert. Specifically, the Phenicies contend that they did not engage in any malicious conduct to warrant the award of punitive damages.

{¶67} The decision whether to award punitive damages is within the trial court's discretion and, absent an abuse of discretion, the court's ruling will be upheld. *Kemp v. Kemp*, 161 Ohio App.3d 671, 682 2005-Ohio-3120 (5th Dist.). "Punitive damages are awarded as punishment for causing compensable harm and as a deterrent against similar action in the future." *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 13. Punitive damages may be awarded if the defendant's actions or omissions "demonstrate malice or aggravated or egregious fraud." R.C. 2315.21(C)(1). The malice necessary for purposes of an award of punitive damages has been defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, (1987), syllabus. Because an individual is unlikely to admit to acting with malice, a finding of malice may be inferred from conduct and surrounding circumstances. *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 37(1989).

{¶68} In its decision, the trial court awarded Seibert punitive damages in the amount of $35,000.00 for the Phenicies' "intentional pumping of water into Stevens Road ditch which then overflowed [the] same and flooded the Seibert farm." (Doc. No. 139 at 12). The trial court found that Seibert established at trial that some of his damages were "the direct result of Defendant[s] Phenicies'

deliberate pumping and flooding of Plaintiff's fields at critical times" and noted that such conduct is the type for which punitive damages may be imposed. (Id. at 10). In setting forth its award, the trial court specifically stated that the punitive damages were imposed "to deter said Defendants from similar misconduct in the future." (Id. at 12).

{¶69} On appeal, the Phenicies contend the trial court's award of punitive damages is erroneous because it failed to make a specific finding that their conduct was malicious. However, the Phenicies have provided no authority for their contention that the lack of a specific finding somehow invalidates the trial court's punitive damages award in this instance. Nevertheless, the trial court's decision clearly indicates that it properly considered the criteria for awarding punitive damages. Moreover, the record supports a finding of malice to justify the award.

{¶70} The Phenicies also argue that the trial court erred in awarding punitive damages because Seibert failed to prove that the intentional pumping caused him "distinct, compensable harm." In support of this argument the Phenicies cite *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, in which the Supreme Court of Ohio considered whether punitive damages are available in negligence cases when compensatory damages are not awarded. *See Niskanen* at ¶ 12, citing R.C. 2315.21(C)(1) and (2) (stating that "[p]ursuant to

statute, a plaintiff must be awarded some measure of compensatory damages to receive punitive damages."). Here, the trial court awarded Seibert compensatory damages based in part on his intentional tort claim that the Phenicies tortuously interfered with his property rights. In addition, Seibert testified to the time and expense the Phenicies' intentional pumping cost him during crucial planting times. Accordingly, we find the Phenicies' arguments regarding the trial court's award of punitive damages to be without merit and overrule their assignment of error.

*Seventh Assignment of Error*

{¶71} In their seventh assignment of error, the Phenicies claim the trial court erred in ordering injunctive relief that permanently enjoined the parties "from introducing into the Pfleiderer Maintenance Tile 919 any artificially accumulated water whether by ditch, waterway or otherwise, so that said tile may naturally drain the land for which is [sic] was designed." (Doc. No. 140 at 2). Specifically, the Phenicies maintain that the trial court's order is contrary to the testimony at trial. The Phenicies also argue that the injunctive relief deprives them of the use of the 919 Tile and certain easements they claimed they have acquired across the Seibert Farm.

{¶72} At outset, we note that a substantial amount of the evidence presented at trial supports the trial court's order for injunctive relief. Therefore, we are not persuaded by the Phenicies' argument in this regard. Next, the

Phenicies raise two arguments on appeal asserting that the trial court's order will deprive them of their property rights: (1) they claim that the order will prevent them from gaining any benefit from the 919 Tile, which they maintain is a public watercourse pursuant to R.C. 6131.59; and (2) they contend that the order will inhibit their access to certain drainage improvements located on Seibert's property which they assert they have a vested right to by virtue of an easement by estoppel.

{¶73} The record demonstrates that the Phenicies failed to raise in the trial court their specific argument regarding the 919 Tile being a public watercourse under R.C. 6131.59. Thus, we will not address this issue on appeal.

{¶74} The Phenicies asserted that they acquired an easement by estoppel to use the 919 Tile and the Lash Tile, both of which are located across Seibert's farm. The Phenicies requested the trial court to declare their entitlement to this easement and order that it be recorded as a vested property right with the County Recorder. Notably, the trial court did not grant the Phenicies' request for this relief in its judgment. Nevertheless, the Phenicies maintain on appeal that they possess an easement by estoppel to continue using the subsurface tiles and other drainage improvements located on Seibert's farm.

{¶75} An easement may be created by estoppel when the "owner of land, without objection, permits another to expend money in reliance upon a supposed easement, when in justice and equity the former ought to have disclaimed his

conflicting rights," in which case, the "owner is estopped to deny the easement." *Monroe Bowling Lanes v. Woodsfield Livestock Sales*, 17 Ohio App.2d 146, 151 (7th Dist. 1969). In order for a party to establish that he has an easement by estoppel, he must show: (1) the landowner made a misrepresentation or fraudulently failed to speak; and (2) reasonable detrimental reliance. *Maloney v. Patterson*, 63 Ohio App.3d 405, 410 (1989). Therefore, an easement by estoppel "cannot be claimed by one who has not been misled or caused in any way to change his position to his prejudice." *Monroe Bowling Lanes* at 149.

{¶76} The Phenicies assert that they when they expended over $100,000.00 to improve the drainage on the Pfleiderer Farm they relied on their agreement with Seibert to use Stevens Road Ditch and the subsurface tiles located on Seibert's farm. The Phenicies appear to insinuate that they would not have invested in the Pfleiderer Farm drainage improvements if Seibert had refused to enter into an agreement with them regarding the Stevens Road Ditch system.

{¶77} However, the Phenicies fail to direct this Court to any evidence that they systematically tiled the Pfleiderer Farm only after reaching their agreement with Seibert. Rather, the record suggests that the Phenicies embarked on their drainage improvements prior to any conversations with Seibert regarding Stevens Road Ditch. Moreover, Seibert testified that Don Phenicie gave him an ultimatum when the ditch discussions initially began. Specifically, Seibert recalled Don

telling him "if you don't help me do it, I'll just run it across you." (Tr. at 269). Seibert estimated that approximately a week later Don approached him with a proposal to excavate Stevens Road Ditch. Thus, the record simply fails to support the Phenicies' contention that they have been misled by Seibert or have been caused in any way to change their position to their prejudice in order to establish the existence of an easement by estoppel. Accordingly, we find no merit in the Phenicies' argument that the trial court's order interferes with their vested property rights and their seventh assignment of error is overruled.

### *Fifth Assignment of Error*

{¶78} In their fifth assignment of error, the Phenicies argue that the trial court erred in awarding Seibert $44,868.81 in prejudgment interest under R.C. 1343.03(A). Specifically, the Phenicies assert that the award was improper because Seibert's claim for breach of contract did not involve a contract for the payment of money, which they contend is a prerequisite for R.C. 1343.03(A).

{¶79} The record reflects that Seibert initially filed a motion for prejudgment interest under R.C. 1343.03(C), the statutory provision related to tort actions, but later filed a motion for leave to amend his request for prejudgment interest pursuant to R.C. 1343.03(A), which governs contract claims. The trial court granted Seibert's motion for leave, over opposition from the Phenicies, and allowed him to pursue his request for prejudgment interest under R.C. 1343.03(A).

A trial court's authority to award prejudgment interest on a breach of contract claim is governed by R.C. 1343.03(A), which provides that a creditor is entitled to interest at the statutory rate "when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction * * *."

{¶80} The Supreme Court of Ohio has stated that "the award of prejudgment interest is compensation to the plaintiff for the period of time between the accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 117 (1995). "[O]nce a party has a judgment for an underlying contract claim, * * * he is entitled to interest [pursuant to R.C. 1343.03(A)] as a matter of law." *Dwyer Elec., Inc. v. Confederated Builders, Inc.*, 3d Dist. No. Crawford No. 3-98-18, *2 (Oct. 29, 1998); *see also Hance v. Allstate Ins. Co.*, 12th Dist. Clermont No. CA2008-10-094, 2009-Ohio-2809; *Bank of Marietta v. L.C. Ltd.* (Dec. 28, 1999), 10th Dist. Franklin No. 99AP–304.

**{¶81}** On appeal, the Phenicies argue that the trial court's award of prejudgment interest was inappropriate because R.C. 1343.03(A) limits prejudgment interest to those contracts that provide for a payment of money that the breaching party failed to pay. In making this argument, the Phenicies rely on the case of *RPM, Inc. v. Oatey Co.*, Medina App. Nos. 3282-M, 3289-M, 2005-Ohio-1280, in which a divided court held that "there must in fact be a debt due under the terms of the contract for the prejudgment provision of R.C. 1343.03(A) to apply." *Id*. at ¶ 67. However, several other courts have refused to follow the majority opinion in *RPM* finding that it is based on an erroneous interpretation of the Supreme Court of Ohio's controlling decision in *Royal Electric*, which upheld an award of prejudgment interest on damages other than for a specific debt due. *Royal Electric* at 117; *see*, *e.g*., *W.O.M., Ltd. v. Willys-Overland Motors, Inc.*, 6th Dist. No. L-05-1201, 2006-Ohio-6997; *Tharo Systems, Inc. v. Cab Produkttechnik GMBH & Co. KG*, 196 Fed.Appx. 366, 377-78 (6th Cir.2006). In this specific instance, we decline to adopt the Phenicies' position that R.C. 1343.03(A) limits an award of prejudgment interest only to contracts involving the payment of money absent any compelling authority to support this proposition.

**{¶82}** Moreover, the Supreme Court of Ohio has articulated the public policy reasons behind the award of interest in stating that:

> *Any statute awarding interest* **has the * * * purpose of compensating a plaintiff for the defendant's use of money which**

-44-

> **rightfully belonged to the plaintiff. Therefore, the entitlement to interest, whether it be prejudgment interest, postjudgment interest, or postsettlement interest, is allowed, not only on account of the loss which a creditor may be supposed to have sustained by being deprived of the use of his money, but on account of the gain being made from its use by the debtor.**

*Hartmann v. Duffey*, 95 Ohio St.3d 456, 2002-Ohio-2486, ¶ 12. (Emphasis sic) (Internal citations omitted). Under these circumstances, we do not find that the trial court abused its discretion in awarding Seibert prejudgment interest pursuant to R.C. 1343.03(A). Accordingly, the Phenicies' fifth assignment of error is overruled.

### *Cross-Assignment of Error*

{¶83} In his cross-assignment of error, Seibert argues that the trial court erred in calculating the amount of prejudgment interest in its award. Seibert requested an award of $51,442.36 based upon the damages he sustained resulting in crop loss, embankment construction, and "prorated damage" to his basement from May 7, 2003 to the date of the trial court's judgment on May 17, 2013. Seibert provided a detailed computation in support of his motion. Upon its review of Seibert's request, the trial court determined an award of $44,868.81 to be appropriate. On appeal, Seibert is seeking an order from this Court remanding the case to the trial court to impose the amount of prejudgment interest he originally requested.

**{¶84}** We note that "although the right to prejudgment interest on a contract claim is a matter of law, pursuant to R.C. 1343.03(A), the amount awarded is based on the trial court's factual determinations of the accrual date of the plaintiff's claim and the applicable interest rate." *Gates v. Praul*, 10th Dist. Franklin No. 10AP-784, 2011-Ohio-6230, ¶ 61. "Courts of appeals review such factual determinations under an abuse of discretion standard." *Zunshine v. Cott*, 10th Dist. Franklin No. 06AP–868, 2007–Ohio–1475, ¶ 26, citing *Dwyer Elec., Inc. v. Confederated Builders, Inc*., 3d Dist. Crawford No. 3–98–18 at * 2. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶85}** Here, the trial court rejected Seibert's calculation of prejudgment interest which included "prorated damages" to his basement. The record demonstrates that Seibert received an estimate for his basement repairs, but had yet to claim any specific out-of-pocket expense for the damage. Seibert also generally disputes the trial court's methodology in deriving the amount of prejudgment interest, but fails to convincingly demonstrate the trial court's calculation to be an abuse of discretion. Accordingly, we are not persuaded by Seibert's arguments regarding the trial court's award of prejudgment interest and overrule his cross-assignment of error.

{¶86} Based on the foregoing, the assignments and cross-assignment of error are all overruled and the judgments of the Crawford County Court of Common Pleas are affirmed.

***Judgments Affirmed***

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**